IN THE MATTER OF PROPOSED AMENDMENTS CONCERNING THE BAR EXAMINATION AND ADMISSION TO THE PRACTICE OF LAW IN THE STATE OF MONTANA.

S.C. 80-120.
March 24, 1980.
609 P.2d 263.

ORDER PER CURIAM:

The Montana Legislature has by resolution requested changes in the procedures and requirements for the admission to the practice of law in Montana. A constitutional amendment was presented to the electorate at the last general election, resulting in an affirmation of the constitutional provision that the Supreme Court continue to be the rule-making authority with regard to admission to the Bar of Montana.

During the past year this Court, in the exercise of its rule-making obligation and with the fundamental purpose being to protect the public from incompetent practitioners and to insure fairness in the

admission of qualified individuals who wish to practice law in the State of Montana, proceeded as follows.

The Court promulgated the following questions to be answered: (a) What should our rules provide concerning eligibility and qualifications for taking the Bar examination? (b) Should graduation from a law school approved by the American Bar Association be required as a condition of eligibility to take the Bar examination? (c) What should our rules provide concerning procedures and practices of the Board of Bar Examiners in conducting their examination? and, (d) Should graduates of the University of Montana School of Law and/or graduates of any other law schools approved by the American Bar Association be admitted to practice law in Montana without taking the Bar examination?

To assist the Court in this search for proper solutions, input was received from widely divergent sources, including laypersons, the academic community, legal and judicial groups. A committee of seventeen persons from all walks of life was appointed by this Court to answer to us with their opinions concerning the four questions enumerated above.

After returns were in upon solicited opinions, a public hearing was conducted by the Supreme Court in the courtroom at the Capitol Building in Helena, Montana, and after proper notice was given to the citizens of the State of Montana, all were invited to attend and voice their opinions. A great share of these people did come and did voice their opinions to this Court.

Thereafter this Court made a thorough review of the most recent studies on the subject of Bar examinations and all related matters, as well as a thorough review of the methods employed by our forty-nine sister states. This has been a mammoth undertaking, and this Court has now reached conclusions that we feel and believe to be the majority thinking from all the sources enumerated. From them we reach our answer to the initial four questions as follows.

First and foremost, the complexity of the law as it has developed in our modern society has rendered our present system for admission to the practice of law outdated and inadequate to serve the

present needs of the legal and judicial system. It necessarily follows that the public is not being properly protected. The wrong people are making threshold decisions that have the effect of transferring control of the admission of lawyers to the Bar away from the court of last resort, i. e., when we eliminate from examination all but graduates from American Bar Association certified schools and extend the diploma privilege to our state law school graduates, we have effectively turned over the selection of who becomes a member of the Montana Bar to the American Bar Association, a nonprofit professional association, and the University of Montana School of Law. This is contrary to all present practice and has no recognizable redeeming value.

The obvious solution and the one we have selected is the institution of a new and modern Montana Bar examination process which will be a prerequisite for admission to the Bar of Montana.

Since the legislature appears to be dissatisfied with the admission policies, the legislature will be asked to bear the burden of any increased expense, and the Montana Bar will be asked to recognize and bear the burden of its responsibility in helping to make the Bar examination a successful part of their obligation to the profession. Also, the fee to sit for the Bar examination will be substantially increased. There must be a balance between serving society and the fact that the law has obtained a complexity in modern times which is just a little too much for the ordinary citizen to assimilate in its totality. When we accept this rationale, there is obvious reason and purpose in evaluating competency through the use of more rigid and uniform minimum requirements for admission to the profession, and this will be done in the public interest.

Therefore, we hold as follows:

■ (1) A Bar examination will be a prerequisite for admission of all law school graduates to the Bar of Montana.

■ (2) Eligibility to participate in the Bar examination will not be limited to any particular class of law schools. The Supreme Court will approve the law schools based on numerous factors including hours of instruction, degree offered, certification by their

own state court of last resort, and other standards including but not exclusive to certification by the American Association of Law Schools and the American Bar Association.

■ (3) There will be an examination to admit practicing attorneys from other jurisdictions who do not qualify under our rule on reciprocity.

■ (4) There will be two examinations given each year.

■ (5) There will be a grandfather clause for any person in the process of becoming a student of the University of Montana School of Law or a present student of that school, and/or people who have applied to take the examination (essentially, all those who have any probable contractual right to expect to be treated under the old rules covering any change in the qualifications to take the Bar examination or qualifications for admission to practice).

## BAR EXAMINATION

This brings us face to face with the multiple problems of reconstruction of the Board of Bar Examiners and the examination process. This, admittedly, is complex and probably the principal reason that reformation has never been more than discussed.

We have an excellent Board of Bar Examiners, but each succeeding administration has taken advantage of their willingness to perform all of the duties required to give a Bar examination without adequate staff and assistance required to make and carry out whatever policy becomes necessary to keep abreast of changing times. So, from the beginning, this analysis is not intended to be in any way a reflection on the present Board of Bar Examiners. If the Board had been given any real encouragement throughout the years, this study would not be necessary.

A misconception exists as to the effect of adoption of the multistate bar examination, i. e., that adoption would cause a great independent change and that this is all that is needed to bring the Montana examination system up-to-date. However, it is amply supported that this is simply a first step toward a complete and meaningful revision of the procedures for examining and licensing

lawyers and, hopefully, toward uniformity in the bar examination process throughout the United States. The multi-state examination would, however, overcome one problem that all bar examiners feel they have: lack of time and resources. As expressed by our Bar Examiners, they simply do not have the time, resources or the desire to take on seventy more students each year from the Montana Law School.

The multi-state examination serves as only a part of the bar examination in most states now using it. Generally, it is supplemented with whatever essay material the examiners feel is required to complete the bar examination process. A hybrid examination, part essay and part multi-state, would justify an overhaul of the present examination's scope, i. e., it is generally thought to be too broad and cover too many subjects. Those states using the combination examination have overcome this problem and have made substantial changes in content and effect of the essay portion. Some have used the multi-state in grading only if the person has done poorly on the essay portion of the examination, or visa versa.

The modern concept is that the State Bar, and especially so if the Bar is unified, will furnish its most recent members to assist and work under the direction of the Board of Bar Examiners. These new members will be making a required contribution to their profession. Example: One segment drafts the required questions on constitutional law and an acceptable model answer. They attend, monitor and grade that portion of the examination under whatever rules are promulgated by the Board of Bar Examiners. The subject content of the examination is published in advance and is held to the basic subjects plus any particular subjects that are peculiar to the state's economic structure.

There shall be at least a minimum right of appeal offered each person taking the examination. The Board of Bar Examiners will determine the scope of this appeal. They will promulgate rules to be approved by the Supreme Court.

In addition to State Bar participation, the Board of Bar Examiners should be funded and able to function as such and to oversee, rather than perform, all of the mundane tasks.

The quality of the bar examiners, their qualifications, and safeguards against their abuse of power are controlled in most states by the Supreme Court. This is perhaps one of the only uniform elements discovered during this project. On the other hand, there are some, like us, who inadvertently or indirectly do not control it. In some states the responsibility has been turned over to the law schools, public educational institutions, and professional associations like the American Bar Association.

Most courts appoint their bar examiners. In Alabama, Alaska, California, Idaho, Nevada, North Carolina, Oregon, Utah and Washington, appointment is made by the governing board of the State Bar Association. In Mississippi, the governor appoints from nominees by the Supreme Court. In these particular jurisdictions (and there are some respectable jurisdictions here), the bar association takes an active part in this program, making it a little less expensive to institute proper methods. Again, we have been talking about this for some time.

In many states, like Montana, where there are no statutory or court rules with specific instructions as to examination procedures and content, or provisions for appeal, the bar examiners dictate their own rules, regulations, bar passage requirements, bar examination content, and provisions for expedient and proper conduct in the discharge of their duties and the conduct of the examination. (Here, we might reiterate that this is just one more example of court loss of control in determining who can take the examination.) The states, including Montana, who operate without official regulation, have turned over the examination process to some other body. Thus, the Montana Supreme Court has little or nothing to say about who becomes a member of the Bar of Montana. We pacify ourselves by saying we have the power, we make the rules, we do this or that, but we do not have anything to say about the individual person who becomes a member of the Montana Bar.

We might say something more about the multi-state bar examination here since it attempts to solve at least some of the problems we have just been addressing and could reasonably be used in every

state. It is confined to the basic legal subjects. It was put together by the conference of bar examiners in 1972 and was made available to anybody who wants to use it. At present it consists of 200 multiple choice questions allocated among six basic areas: Contracts (40 questions); Constitutional Law (30 questions); Criminal Law (30 questions); Evidence (30 questions); Real Property (30 questions); and Torts (40 questions). There has been talk of putting Ethics in the examination, but this has not been done yet. These questions are developed in cooperation with the Educational Testing Services and all papers are graded by their headquarters. It is a computerized situation reducing the possibility of subjectivity and inequity. Forty-three states have accepted this examination, and the District of Columbia is now using or planning to use it. In each case, these states supplement the examination with questions promulgated by their own bar examiners.

■ (1) We will adopt the multi-state bar examination to be supplemented by essay-type questions recommended by the Board of Bar Examiners and approved by the Supreme Court.

■ (2) As indicated previously, there will be a substantial increase in the fee for sitting for the Bar examination in Montana, which will include the cost of the multi-state bar examination plus a minimum of $125.00 additional fee which will help defray the remaining costs of the Bar examination. Administrative costs are on the increase and the Board of Bar Examiners that is working with the State Bar is directed to investigate costs, implement a plan, and submit the proposals to the Supreme Court.

■ (3) Any person who has qualified to sit for the state Bar examination will be limited to sit three times within a five year period, except by petition to the Supreme Court.

## QUALIFICATIONS AND ADMISSION TO PRACTICE

■ (1) Reciprocity. The fact that an applicant is practicing in a sister state and that that state extends reciprocity to Montana shall be prima facie evidence of fitness to practice in this state and

to be admitted on reciprocity, reserving to the Supreme Court the power to review such circumstances as might be indicated.

(2) Clinical training. Our own profession has been critical in the recent past, from Chief Justice Burger to Chesterfield Smith, on the ability of lawyers to properly perform their duties and particularly in the trial of cases. This criticism does not come from the general public. The composite of their comment is that we have never had so many well-qualified applicants or so many law schools as we have today. So, we must, if we change at all, provide a system that will furnish better lawyers to the profession.

The collapse of the apprenticeship system has been accepted by the bar and the courts with little or no regard or concern for substituting more adequate formal or practical training in the clinical sense. Plainly stated, the Bar of the United States has abdicated its role in the education of lawyers. Public authorities, namely the courts and the bar examiners, have failed to protect the public against the effect of licensing lawyers who have never seen a client or a judge.

Each one of the segments referred to here have cooperated or collaborated in licensing lawyers without any practical training. Somehow they believe that graduates are qualified based on the work they do in law school, with absolutely no clinical training that amounts to anything. They adopt a laissez-faire attitude that each lawyer who practices will become competent one way or the other. This leaves the public to protect and shift for itself. And again, as this clinical training has become more and more important to law schools and to us, it has vanished insofar as the examining process after law school is concerned. It comes down to this—that it is a very important part of the process that has been avoided up to now and it is not likely to go away.

The complexity of our profession is becoming more evident everyday. Clinical training is essential in some form or another, and it is going to have to be required. The lawyer who is looking to be admitted to the Bar must have some kind of clinical training and "X" number of hours of some kind of experience in that area

before he presents himself to the public. This may be accomplished before or after they sit for the Bar examination, but the system must regulate the practice of those who have not completed their training.

We feel it is desirable to institute minimum requirements for clinical training by the law graduate before final admission to the State Bar of Montana. We have seen the law schools change in response to pressure for clinical legal education, and as the changes have occured in law schools, it is time now also to look at the process for qualifying persons for admission to the Bar. Without exception, the process needs modernization. The Bar admission rules for student practice have, of course, introduced some clinical training into the law school curriculum. As is so sorely needed, this has begun to make a change for the better in the law school. However, the vast majority of Bar admission authorities, including Montana, have not kept abreast of the changes that are being made in the law schools. We would approve supervised clinical training during law school, e. g. law office internships, judicial clerkships, public defender projects, prosecuting attorney internships, legal aid societies, and similar activities approved by the Board of Bar Examiners.

The Board of Bar Examiners is directed to promulgate rules relating to clinical training as a condition for admission to practice, as set forth above in terms of experience internships, and the like. These rules will be submitted to the Supreme Court for approval.

(3) Diploma privilege. There is no substantial or acceptable argument for retention of the diploma privilege. Its primary purpose has long since ceased to exist —i. e., incentive to attract students to a small law school as it struggles to gain recognition in the legal community or the common argument that the last quarter of law school must be devoted to preparing the student for the bar examination which is a detriment to their normal course of study.

There is, in fact, a double standard created by the diploma privilege and the Bar examination as it relates to admission to the

Bar in Montana. This standard goes beyond the courses offered in the law school and given on the Bar examination. It is the fact that the diploma privileged person enters the job market in June, whereas a Montana resident forced to attend an out-of-state law school must wait until October to take the examination, and in some cases does not pass fairly enough, many people have elected to attend schools outside the State of Montana. It is also noteworthy that the University of Montana School of Law is no longer struggling. It is turning away many, many students who are Montana residents and who would like to remain here to go to school. Also, we should be encouraging our young people to go to other schools outside the State of Montana for the diversity of educational background and the intellectual exposure which is essential in a free society. There is no doubt that the University of Montana School of Law is very good, but concentrating Montana graduates into the Montana Bar becomes dangerously parochial.

The effect of a diploma privilege on the student and on the faculty of a law school that extends the privilege is subtle but sometimes harmful. There exists the possibility of abuse and the standards of the law school may be affected by the fact that nobody really does his best until he has to. Knowing that their students are not to be examined, some professors may be prone not to put forth their best efforts, or at least a better effort than they did the previous year teaching the same course. Under some circumstance, the curriculum can be adjusted to teach the students what they want the students to know, and there is nothing in the world to prevent this.

E. Marshall Thomas, the former chairman of the National Conference of Bar Examiners, makes the point that even though all subjects were the same on the school curriculum and on the bar examination, it would still not be an idle act to require that they take the examination since it serves a real additional purpose. The fact that the law student knows he must face the Bar examination after graduation and before admission to practice is a healthy, educational stimulant. Mr. Thomas further contends that it is also a stimulant to the law school faculty to maintain high standards of

legal education because the faculty knows that their students will be examined by state authorities. He says that the Bar examination serves an additional function in that the Bar examination has one essential difference from the law school examination—it is a comprehensive examination covering the entire field of several years of law study.

Further, the American Bar Association has taken a positive, clear and very hard stand against the diploma privilege in connection with the standards of legal education and A.B.A. approval of law schools. Further, there are very few jurisdictions left which permit this kind of privilege. The A.B.A. Section of Legal Education and Admission to the Bar is very strong in its opinion that graduation from a law school should not confer the right of admission to the Bar and that every candidate should be subject to an examination by a public authority to determine his/her fitness.

The University of Montana School of Law has stressed that the Supreme Court members, or rather two of them, are on the Board of Visitors and can oversee and control the curriculum of the school. The A.B.A. says that this is not right, that there is no public officer or officers or departments who control the curriculum of any school. Their job is to see that the school turns out properly educated people who can adequately serve the public. Any attempt to control curriculum content would be an unfortunate limitation of the educational freedom of the school and could not be tolerated in the name of the diploma privilege.

It follows then that to reach our ultimate goals, the diploma privilege must be eliminated. However, at that time, those students who have applied and will be accepted or are accepted or are in the law school when these changes are made, will be given the benefit of all privileges held out to them, i. e., a grandfather-type concession will be afforded to those with any remote contractual right to be a beneficiary of the diploma privilege, as set forth above.

This Court orders the diploma privilege abolished in conjunction with the other changes to be made in our qualifications and admissions to practice.

(1) The Bar examination shall not be limited to those graduates of American Bar Association approved laws schools, but rather the Supreme Court of the State of Montana under conditions set forth in this opinion will approve the law schools from which students may apply to sit for the examination in Montana.

(2) We have provided a grandfather clause in any changes in qualifications.

(3) We have retained the present rule on residency.

(4) We have authorized the adoption of the multi-state bar examination to be supplemented by an essay type examination recommended to the Supreme Court by the Board of Bar Examiners.

(5) We have authorized an increase in the minimum fee for taking the Bar examination to cover the additional costs required for the updating of the examination and for the multi-state bar service.

(6) We have authorized and ordered the Board of Bar Examiners in conjunction with the State Bar to investigate rising administrative costs and the effect of inflation, and to implement a plan and submit proposals to the Supreme Court.

(7) We have directed that the Bar examination be given two times each year.

(8) We have made limitations on the number of times a person qualified can sit for the Montana Bar.

(9) We have provided for administrative review to be initiated by anybody who takes the Montana Bar.

(10) We have retained our six-month residency requirement for admission to the Bar in Montana.

(11) We have retained a reciprocity consideration for outside attorneys whose states grant the same privilege to Montana.

(12) We have provided and directed that a rule be drawn requiring experience in terms of internships and clinical training as a prerequisite to admission to practice; and that the Board of Bar Examiners is to promulgate rules relating thereto and submit them to the Supreme Court for approval.

(13) We have, for good reasons, abolished the diploma privilege.

(14) As said above, for all changes to be brought about by this opinion, we of course are extending a grandfather clause to those who are entitled.

We think in all fairness and in good conscience that we can do no less than to agree with most of the criticism and comment given us by those invited to stand before us, who filed briefs, and the secondary text material, which without question gives a very detailed and knowledgeable analysis of the system including portions that are important to us and the changes that we contemplate making. The rulings in this opinion, we think, fairly accomplish the matters upon review and will provide a better system when perfected for those wishing to practice law in Montana. We think the rulings are fair and just for all concerned.